(119 App. Div. 302)

## PEOPLE v. BURNHAM.

(Supreme Court, Appellate Division, First Department.  May 31, 1907.)

**1. LARCENY—ELEMENTS—STATUTES.**

Under Pen. Code, § 528, subd. 2, providing that a person who, with intent to defraud the true owner of his property, or to appropriate the same to the use of the taker or of any other person, having in his possession, as bailee or officer of any person or corporation, any property, appropriates the same to his own use, or to that of any other person other than the true owner, is guilty of larceny, the prosecution, to support a conviction of an officer of an insurance company of larceny of its funds, must prove that the officer, having in his possession as bailee or officer funds, appropriated the same to his own use, or to that of any other person, and that the appropriation of the funds was with intent to defraud the company thereof, or to appropriate the same to the use of the officer or any other person.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Larceny, §§ 3–10, 39–42.]

**2. SAME—MISAPPROPRIATION OF FUNDS—EVIDENCE—SUFFICIENCY.**

The general counsel of an insurance company, who was also a trustee and vice president thereof, made a settlement of pending suits against the company, and included in the settlement an action brought against its president individually, and received money from the company under a warrant signed by himself and a majority of the executive committee for the purpose of settling the suits. The person who had brought an action against the president of the company had also presented to the company the identical claim, and had demanded that the company pay him. *Held*, that the evidence was not sufficient to support a finding that the general counsel had misappropriated the funds of the company in paying the individual for his claim against the president, though in carrying out the settlement of the suits the president of the company was incidentally benefited.

**3. SAME—INTENT—EVIDENCE—SUFFICIENCY.**

The general counsel of an insurance company, who was also a trustee and vice president thereof, made a settlement of pending litigation against the company, including an action brought against the president thereof individually. The person bringing the action against the president had first made a claim against the company. The general counsel used the funds of the company in paying the claim of such person as a condition of a settlement of other litigation against it, which, if the company had been unsuccessful, would have involved a greater amount than was paid. There was no evidence that the claim of the person who sued the president was not a claim against the company. *Held*, that a finding that the use of the money of the company in paying the claim of the person who sued the president was with intent to defraud the company, essential to sustain a conviction of larceny of the money, was not authorized.

**4. CRIMINAL LAW—ERRONEOUS EXCLUSION OF EVIDENCE—CONVICTION—AFFIRMANCE.**

The exclusion, on the objection of accused in a criminal case, of proper evidence sufficient to prove a fact essential to a conviction, will not justify an affirmance of the conviction.

**5. LARCENY—EVIDENCE—ADMISSIBILITY.**

On a trial of an officer of an insurance company for the larceny of its funds, based on his act in using the funds thereof in paying a claim of a third person made against another officer individually, the record of the meetings of the board of directors of the company, authorizing the settlement of suits against it and the payment of the claim of the third person, was competent, as showing the authority of the executive committee to issue a warrant against the company for the funds used in the

settlement, and as bearing on the good faith of the officer in obeying the instructions of the executive committee in using the funds of the company in settling the claim.

**6. SAME.**

Where, on the trial of an officer of an insurance company for the larceny of its funds, based on the officer's act in using the same to pay the claim of a third person against another officer individually, it was not shown that the accused had anything to do with the keeping of the books of the company, the admission in evidence of the corporate books, containing an entry respecting the payment of the claim of the third person, was erroneous.

**7. SAME.**

On a trial of an officer of an insurance company for the larceny of its funds, based on the officer's act in using the same to pay the claim of a third person against another officer individually, evidence of a receipt given by accused to another for the deposit of canceled checks, and the checks, which indicated that they had passed to the credit of the superintendent of insurance, was inadmissible, where the receipt and the checks had no connection with the company, or with the transaction forming the basis of the charge of larceny.

**8. SAME—EVIDENCE.**

On a trial of an officer of an insurance company for the larceny of its funds, based on the officer's act in using the same to pay a claim of a third person against another officer individually, the prosecution must not only prove that the funds of the company were used to pay the claim of the third person, but also that the claim was one for which the company was not liable.

**9. SAME—EVIDENCE—INSTRUCTIONS.**

Where, on a trial of an officer of an insurance company for the larceny of its funds, based on his act in using the same to pay the claim of a third person against another officer individually, the evidence showed that the settlement of suits against the company was dependent on the payment of the claim of the third person, and that by the payment of the claim of the third person the company was enabled to cancel all existing claims against it, including whatever claim the third person had against it, an instruction that if the claim of the third person was not paid to the extent of over $5,000, but it was agreed that upwards of $500 was to be applied toward the settlement of the claim, a finding that accused was guilty of grand larceny was authorized, was erroneous, because calling the attention of the jury solely to the claim asserted against the other officer individually, without allowing the jury to consider the fact that the payment of that claim released the company from other claims.

Appeal from Trial Term, New York County.

George Burnham, Jr., was convicted of grand larceny in the first degree, and he appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, LAUGHLIN, CLARKE, SCOTT, and LAMBERT, JJ.

Morgan J. O'Brien, for appellant.
Robert C. Taylor, for the People.

INGRAHAM, J. This appellant was indicted, with two other persons, for grand larceny in the first degree. The indictment contains nine counts, but the district attorney elected to proceed upon the first and second counts. The first count is based upon the larceny of the sum of $7,500 of the Mutual Reserve Fund Life Association, and the second count alleges that the three defendants, jointly having in their

possession, custody, and control certain goods, chattels, and personal property of the said association, who was the true owner thereof, to wit, the $7,500 mentioned in the first count of the indictment, did feloniously appropriate the said property to their own use, with intent to deprive and defraud the said corporation of the same and of the use and benefit thereof, and the same goods, chattels, and personal property of the said corporation did feloniously steal, against the form of the statute in such case made and provided. This indictment was based upon section 528 of the Penal Code; the first count being under the first subdivision of that section, and the second count under the second subdivision. I do not understand that the district attorney claims to sustain the conviction under the first count; but it is under the second count, based upon the second subdivision of the section, that the conviction is sought to be upheld. That subdivision provides that:

"A person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person, * * * having in his possession, custody or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association or corporation, * * * any money, property, evidence of debt or contract, article of value of any nature or thing in action or possession, appropriates the same to his own use, or that of any other person other than the true owner or person entitled to the benefit thereof, steals such property and is guilty of larceny."

This section has been lately under discussion both in this court and in the Court of Appeals in the case of the People ex rel. Perkins v. Moss, 113 App. Div. 329, 99 N. Y. Supp. 138, affirmed 187 N. Y. 410, 80 N. E. 383. The Court of Appeals, Judge Gray delivering the opinion of the majority of the court, said:

"It is apparent that what constitutes the crime of taking the property of another for the use of the taker, or that of any other person than the legal owner, is the intention with which the act is committed. Under the statute the crime of larceny no longer necessitates a trespass; but it does need, as an essential element, that the 'intent to deprive or defraud' the owner of his property, or its use, shall exist. The intent, by necessary implication, as from its place in the penal statute, must be felonious; that is to say, an intent without an honest claim of right. It is not now essential, as it was under the Roman and early English law, that the intention of the taker should be to reap any advantage from the taking. The statute makes the crime to consist in the intent to despoil the owner of his property. That is necessary to complete the offense, and if a man, under the honest impression that he has a right to the property, takes it, it is not larceny, if there be a colorable title. * * * The charge of stealing property is only substantiated by establishing the felonious intent. Without it there is no crime; for it would be a bare trespass. It is the criminal mind and purpose, going with the act, which distinguish the criminal trespass from a mere civil injury. * * * It is of the very nature of crime that the criminal act should involve the violation of a public law, or a wrong, which, because grossly immoral and vicious, affects the public injuriously."

And subsequently, calling attention to section 548 of the Penal Code, it was said:

"This section is an expression of the emphasis which the statute lays upon the intent with which the property of another is taken. It is a qualification of the provisions of section 528 of the Penal Code, defining what should constitute the crime of larceny."

In the consideration of this case, therefore, we must start with the proposition that, to sustain this conviction, we must find that this defendant appropriated money of the Mutual Reserve Fund Life Association, in his possession, custody, or control, to his own use, or to that of another person, with intent to deprive or defraud the true owner of its property, or of the use and benefit thereof.

This defendant had been elected in the year 1898 a director of the Mutual Reserve Fund Life Association, and its general counsel, and in 1900 he had been elected a vice president and continued as general counsel. Frederick A. Burnham, his brother, was the president of the company, and George D. Eldridge was a vice president. The executive committee for the year 1900 consisted of Frederick A. Burnham, George D. Eldridge, and Richard Deeves. In September or October, 1900, one George E. Joseph, an attorney at law, had several claims against this company, to recover for some of which actions had been brought. Joseph, who was a witness for the prosecution, testified that he had commenced as attorney an action by one Armstrong against the Mutual Reserve Fund Life Association, and an action by Bendix against the company, and that he had two claims of Abraham Levy and one of Rosalie Levy against the corporation. Prior to the 28th of February, 1899, one James D. Wells had presented to the company a written statement of items for which he claimed that he was entitled' to be paid by the company. Wells had been an employé of the company, but at that time had either resigned or been discharged. That statement having been delivered to the vice president of the company on the 28th of February, 1899, Wells had an interview with the vice president in relation to this claim. The statement contained various items of alleged disbursements made by Wells, is headed "Memo. of Disbursements by J. D. Wells," and aggregates something over $12,-000. One of those items is "F. A. Burnham, $5,575." At this interview Wells said in relation to this item:

"It is money I paid out for the company at Mr. Burnham's request, and I expect the company to reimburse me for it. If the company does not reimburse me for it, I shall make a claim upon Mr. Burnham for reimbursement."

Wells, who was a witness for the prosecution, does not deny this statement. No settlement having been arrived at, Wells commenced an action against Frederick A. Burnham individually to recover this item of $5,575, alleging in the complaint that it was money that he had loaned to said Burnham. Subsequently, and on September 20, 1900, Joseph, as attorney for Wells, under the firm name of Nichols & Bacon, of which firm he seems to have been a member, wrote to the Mutual Reserve Fund Life Association, stating that Mr. James D. Wells had made a demand upon the company for a statement of accounts of renewals due to him upon Canadian business, and demanding that the company furnish him forthwith a detailed account of such renewals to date. Armstrong, the plaintiff in one of the suits against the company, had had a contract with the company which it had repudiated. The computation as to the amount which could be claimed under the contract, if it was valid, made by the officers of the company, showed a total in the neighborhood of $400,000. An action

upon a similar contract had been brought against the company by one Caldwell, which had resulted in a judgment against the company for upwards of $56,000, which judgment had been reversed by the Appellate Division upon the ground that the contract was ultra vires; but from this judgment the plaintiff had appealed to the Court of Appeals. Subsequently that appeal was withdrawn, and the new trial ordered by the Appellate Division was pending before a referee, where it is still undetermined. Joseph, as attorney, represented Armstrong, who was the owner of this claim on this contract, and who had commenced an action against the company on a policy of insurance held by him, and which was pending at the time of the settlement upon which was based this prosecution. Joseph had an interview with the defendant, who was the general counsel of the company and was defending these actions brought against the company. This interview, which seems to have been brought about at the request of Joseph, who had made repeated efforts to see the defendant in regard to his claims against the company, took place about the end of September or the beginning of October, 1900. According to Joseph's version of this interview, after some talk about the claims, the defendant said, "Why can't we settle up all these matters?" to which Joseph replied, "I don't know why we can't." Burnham then asked Joseph how much he wanted, and that matter was left in that situation for a subsequent interview. Joseph consulted with his clients, and a few days later again saw the defendant at defendant's office. Joseph told the defendant that Wells would not take less than the face of his claim, which was $5,575; that he demanded in the Armstrong case $2,500, in the Bendix case $500, and in settlement of the Levy claims $2,000. In addition, he stated that his fees in the Wells case would have to be paid by the company. To that the defendant said, "Well, there is no use of settling these matters while the Paterson case is standing;" that he did not want to settle Joseph's claim, unless Joseph could get Paterson out of the way. Joseph did not represent Paterson at that time, and said to the defendant, "What do you want me to do?" Deponent said, "Well, I would like to tie this whole thing up in escrow until we get Paterson out of the way," when Joseph said, "If I am going to undertake the job of getting Paterson out of the way, you will have to pay for that;" and the defendant then asked Joseph to undertake that work. Joseph then demanded $3,000 as the sum which he would require to be paid to get Paterson out of the way, which made a total amount of $13,500, and that amount was finally agreed to, which would include the settlement of the Paterson litigation with the company. Joseph testified that he knew that Wells was very intimate with Paterson, and could control him, and he was therefore willing to have the settlement depend upon his being able to include Paterson in the settlement. It was then agreed that $6,000 should be paid upon the release of the Armstrong, Bendix, and Levy claims, and $7,500 should be placed in what was called "escrow," dependent upon the final settlement of the Paterson claim and the delivery of general releases from Wells to Burnham and to the company. That arrangement was subsequently carried out, $6,000 was paid to Joseph, and

the. releases of the Armstrong, Bendix, and Levy claims were delivered, and releases of Wells to the company and to Burnham individually, and an assignment of the Wells claim against Burnham, with a check for $7,500, was deposited with the president of a trust company, to be delivered when the Paterson litigations were finally discontinued and settled. Something over a year after this, these litigations were finally settled, when the papers that had been deposited with the president of a trust company were delivered—the releases and discontinuance to the corporation and the check for $7,500 to Joseph. At the same time an agreement was made by Joseph by which he was retained by the company as attorney.

This conviction is based upon the claim that the defendant was guilty of larceny in appropriating the sum of $7,500 of the money of the Mutual Reserve Fund Life Association for the settlement of the personal claims of Wells against Frederick A. Burnham individually. To justify the conviction of the defendant, the people are bound to prove two propositions: First, that the defendant, having in his possession, custody, or control, as a bailee, servant, agent, clerk, trustee, or officer of the Mutual Reserve Fund Life Association, the sum of $7,500, or some other sum of money, appropriated the same to his own use, or to that of any other person, other than the true owner or person entitled to the benefit thereof ; second, that this appropriation of the money of the association was with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker or any other person, or, as Judge Gray says, prove the "criminal mind and purpose going with the act."

The defendant, the general counsel of the association, made a settlement of pending litigations against the company, in which settlement was included an action that had been brought against the president of the association individually, alleged to be for money loaned to him, and paid therefor money that he had received from the company for that purpose. He received and could receive no possible benefit or advantage from the settlement, and carried out faithfully the instructions that he had received from the officers of the company. The individual claim against the president of the company, which was included in this settlement, was based upon a verified complaint, in which it was alleged that Wells, the plaintiff, had loaned to Frederick A. Burnham the sum of $5,575. The president of the company had, by a verified answer, denied every allegation of the complaint. and the case was at issue. Wells was called as a witness for the prosecution, but there was no evidence as to the nature of this claim; that there ever had been a loan to Frederick A. Burnham, or that the entire transaction, whatever it was, was a transaction for which the company was not liable, or would not have been bound to assume any liability that existed against its president. The settlement was directed by the executive committee, of which the defendant was not a member. The company received the benefit of the settlement, the actions against it were discontinued, the persons making the claims against it released the company from liability to them, and, accepting Joseph's testimony,

it would appear that the settlement could not have been completed unless Wells was paid the amount of his claim. It is true that the defendant was a trustee and vice president of the company, and also its general counsel; that he had conducted these negotiations for a settlement, and had received the money from the company under a warrant signed by himself and a majority of the executive committee; and, assuming that he was responsible for the determination to settle this litigation, which would include a claim against the president of the company individually, there could be no wrongful appropriation of the company money, unless it was used to pay a claim for which the corporation was not liable. Whether or not the president of the company was also liable to the creditor was entirely immaterial. I have searched this record in vain to find a particle of evidence that the claim of Wells that was settled was a claim for which the corporation was not liable. Wells had presented to the company this identical claim, for which he subsequently sued the company's president, and demanded that the company pay him that amount, and in explanation of that claim he told the vice president that that amount was money he had paid out for the company at Frederick A. Burnham's request, and he expected the company to reimburse him for it. Thus, upon the record as it stands, Wells had made this as a claim against the company on the ground that it was money paid out for the company at the request of its president. In addition to the amount involved in the action against the president, there was a claim by Wells against the company, which had never been withdrawn, and which the company might at any time have to meet. Taking the whole evidence together, the settlement of the several litigations and claims, including this claim against the company, authorized by the responsible officers of the company, entered into under their authority, and their instructions literally carried out, even if such a settlement incidentally benefited the president of the company and possibly would entail some civil liability, is not sufficient to sustain a conviction that this defendant had misappropriated the money used in carrying out that settlement and was guilty of larceny.

But when we come to consider the second condition that must be proved to justify a conviction, viz., the criminal intent of the defendant, it seems to me that the evidence, taken as a whole, clearly negatives such an intent. It appeared without contradiction that before the settlement was actually carried out and this money fully paid various attacks had been made upon this company by Wells and by a man named Paterson, who was closely associated with him, and that these charges had resulted in various criminal proceedings being taken against Paterson, and various actions for libel commenced against Wells and Paterson, by officers of the company and by the company. Paterson had also commenced the action for malicious prosecution, claiming $50,000 damages. In these litigations the corporation was represented by Mr. Edward C. James, a prominent member of the New York bar. Acting under instructions from the company, the defendant had taken measures to ascertain whether these litigations could be settled. After the last interview with Joseph, the defendant reported to Mr. Eldridge,

first vice president of the company; Mr. Frederick A. Burnham, the president, being than absent. It was ascertained that the total amount that Armstrong could claim on his contract would be upwards of $400,000, if the contract should be sustained, and the amount for which this claim, with the others mentioned, could be settled, was stated to be $13,500. Eldridge said that this should be considered by the executive committee, and nothing further was done until the return of Mr. Frederick A. Burnham, when Mr. Eldridge, Mr. Frederick A. Burnham, Mr. Edward C. James, and the defendant had a conference upon the question as to what should be done in relation to this offer. It seems that this corporation, which had been prior to that time an assessment corporation, had made or was about to make an application to the insurance department to conduct its business upon what is called a "straight premium basis." The charges that had been made by Wells and Paterson, and out of which the libel suits and the action for malicious prosecution had grown, would be republished if the actions were tried, and the officers of the company had to consider this fact in relation to its effect upon its application. The defendant stated that this settlement involved the discontinuance of Wells' action against the president of the corporation, and there was then a discussion as to what should be done. The evidence is that both Frederick A. Burnham and Eldridge strenuously objected to the settlement of Wells' claim, but that Mr. James strongly advised them to make that settlement; that there was an element of danger in the Armstrong contract, which alone justified the company in making the settlement, as that contract might involve the liability of the company for a large amount. Frederick A. Burnham and Eldridge, being a majority of the executive committee, finally agreed to follow Mr. James' advice, and they prepared what is called a warrant directing the preparation of a check for the amount required to effect its settlement, which was delivered to the defendant. Mr. James is dead, and Eldridge and the defendant testified as to what happened at this conference, which resulted in the settlement of the controversy and the payment of the money; but the entry upon Mr. James' diary shows that he had such a conference on the day named.

I cannot see that there is any evidence to justify the finding of the jury that this settlement was in bad faith and with intent to defraud. The fact that, in an action based upon a contract like that of the Armstrong contract, the plaintiff had recovered a judgment on the trial, and that that judgment had been reversed in the appellate court upon the ground that the contract was ultra vires, certainly was not a final determination of the claim, the settlement of which would be evidence of bad faith. Judgments of the Appellate Division had been before reversed, and, irrespective of the fact that a controversy based upon a breach of that contract would involve the expense of defending it, it cannot be said to be evidence of bad faith or intent to defraud that the officers of the company were willing to pay a small amount to be relieved from any claim under it. The withdrawal of the libel suits and the action for malicious prosecution, and the ending of the litigations that had grown out of these attacks upon the company and its officers,

cannot be said as a matter of law to be an injudicious settlement for the company to make. The whole case against this defendant is thus based upon the fact that Wells, having first made a claim against the company for money alleged to have been paid out for its benefit by the direction of the president, had subsequently brought an action against the president individually for the money as having been loaned to him, and that the company had paid that claim as a condition of a settlement of other litigations against it, which, if the company had been unsuccessful, would have involved a much greater amount than was paid, without any evidence that Wells' claim was not a claim against the company, or for which the company would be ultimately liable, and without the slightest evidence of bad faith or intent to defraud, except the mere fact that the action that was settled was an action against the president individually. It seems to me that a finding by the jury that this was in bad faith, with intent to defraud the company, was without evidence to sustain it.

In the absence of the jury, the district attorney made an offer of evidence, some of which was incompetent, but part of which would have tended to show the nature of the transaction between Wells and Frederick A. Burnham by which the latter received the money from Wells. The defendant objected to all this testimony, and the court excluded it, with the statement "that the usual course would be to exclude this testimony, establish a personal claim, and then we can tell how the case will unfold, and there may be something which develops which makes it competent"; the result being that the case was left barren of proof to show that the claim made against Frederick A. Burnham was not of such a character that it would be and was in fact a company obligation, and one for the settlement of which the funds of the company could properly be used. I understand that a person cannot be convicted of a crime without proof of the fact which justifies a conviction, and the exclusion by the court of evidence which would have proved such fact, on objection of the defendant, will not justify an affirmance of the conviction.

There were several rulings upon questions of evidence which were excepted to, and which, I think, were errors. There was produced by the people, and identified, the minutes of a meeting of the board of directors at which a report was made in relation to the actions of Morse, Wells, and Hill in connection with the company. This was marked for identification, and subsequently offered in evidence by the defendant, but was objected to by the people, and the objection sustained. The defendant also offered a resolution of a meeting of the board of directors held on the 7th of March, 1900. Objection to the admission of that was also sustained, and the defendant excepted. At both of these meetings the defendant was present, and at both meetings the executive committee were authorized to take action in relation to the claims of Wells and Paterson. I think the record of these meetings was clearly competent, as showing the authority of the executive committee to act in the settlement of the Wells and Paterson claims, and bearing upon the good faith of this defendant in obeying the in-

structions of a majority of the executive committee in relation to these settlements.

There was also evidence admitted, against the objection and exception of the defendant, in relation to the entry in the books of the corporation respecting this payment, which was incompetent as against this defendant. He was not shown to have had anything to do with these books, or any knowledge of their contents, or any connection with the entries. The books of a corporation are not evidence as against an officer of the corporation in a criminal prosecution against him. Rudd v. Robinson, 126 N. Y. 113, 26 N. E. 1046, 12 L. R. A. 473, 22 Am. St. Rep. 816.

I think the admission in evidence of the receipt given by the defendant to George B. Paterson for the deposit of the canceled checks, and the checks themselves, which indicated that they had passed to the credit of the superintendent of insurance, was error that would require a reversal of the judgment. These exhibits had no possible relation to or connection with the corporation, of which the defendant was counsel and an officer, or with the transaction which was then under investigation. The fact that these checks had been indorsed by the person who then occupied the position of superintendent of insurance would tend to prejudice the jury against the defendant. The evidence was entirely incompetent, and could have only been introduced to prejudice the jury against the defendant, which, from the insinuations in the questions of the district attorney and the statement of what he intended to prove in relation to them, they were calculated to do. After this cross-examination ended, counsel for the defendant moved to strike out all of the cross-examination of the witness directed to the subject of this transaction, or alleged transaction, between some officer of the Exempt Firemen's Association and Payn or the United States Express Company, or any one else, and the custody of papers delivered to the witness by Paterson. This motion was denied, and the defendant excepted. I think the allowance of much in the cross-examination of the defendant was an abuse of the discretion of the court.

There are other exceptions to rulings upon questions of evidence with which I do not agree, but which it is not necessary to discuss. I also think that the learned trial judge entirely misconceived the construction to be given to this statute. The jury were told:

"Under the law, therefore, if as matter of fact the money of the association was illegally and wrongfully appropriated to pay or settle a private claim asserted against Frederick A. Burnham, and if, as a matter of fact, the defendant, George Burnham, Jr., as counsel or as officer of the association, aided or abetted or counseled the act, with the intent to deprive or defraud the real owner of the money, then the jury might find that George Burnham, Jr., the defendant, was a principal."

And, further:

"The inquiry, therefore, might be pursued along these lines: First. Was the money of the Mutual Reserve Fund Life Association used to pay a personal claim asserted against Frederick A. Burnham? Second. Was this result aided and abetted by the defendant? Third. Did he intend to deprive or defraud the association of its money?"

Now, as I conceive, much more was required than to prove that the money of the Mutual Reserve Fund Life Association was used to pay personal claims asserted against Frederick A. Burnham. In addition to that, to justify a conviction, it was necessary to prove that the claim was one for which the corporation of which Frederick A. Burnham was president was not liable.

Again, the court charged:

"Even if the Wells claim was not to be paid to the extent of $5,575, but if it was agreed that upwards of $500 of the settlement was to be applied towards the settlement of the claim, you would be justified in finding the defendant guilty of grand larceny, assuming, of course, the finding is warranted by the facts and the law as laid down to you."

As I read this evidence, there is no dispute but that the settlement of the whole controversy was dependent upon the payment of Wells' claim, and that by the payment to Wells of his claim the company was enabled to get out of existence all of the claims, including whatever claims Wells had against the company; but by concentrating the attention of the jury solely upon the individual claim asserted against Burnham, without allowing them to consider the fact that the payment of that claim of Wells asserted against Burnham released the company from other claims and demands which might have seriously embarrassed it, the case was presented to the jury in a way extremely unfair to the defendant.

My conclusion is that the testimony as a whole did not justify the conviction of the defendant, and that there were errors committed, both in rulings upon questions of evidence and in the method by which the case was submitted to the jury, that require us to order a new trial.

The judgment is therefore reversed, and a new trial ordered. All concur.

