(92 Misc. Rep. 519)

INTERSTATE CHEMICAL CORP. et al. v. DUKE.

(Supreme Court, Special Term, New York County. December 9, 1915.)

1. SALES ⟨⟩⟩24—OPTION TO BUY—WHAT CONSTITUTES—MANUFACTURE OF FERTILIZER.

Under contracts entitling D., through the medium of a corporation to be formed by him, to purchase an interest in certain properties and patent rights for the manufacture of fertilizer so that, through the additional capital furnished by him, fertilizer might be manufactured on an extensive scale, and providing "that the said D. shall be entirely free not to avail himself of the foregoing option if the test * * * shall not be satisfactory to him," D. was the sole arbiter of whether the tests were satisfactory and whether he should proceed with the undertaking.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 49–51; Dec. Dig. ⟨⟩⟩24.]

2. SALES ⟨⟩⟩24—"OPTION"—"CONTRACT FOR AN OPTION."

An "option" is an exclusive privilege to buy, and a "contract for an option" is the agreement by which the privilege is created. An option neither transfers nor agrees to transfer title to property, but confers the bare right to accept an offer within the time limited and upon the terms provided.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 49–51; Dec. Dig. ⟨⟩⟩24.

For other definitions, see Words and Phrases, First and Second Series, Option.]

3. SALES ⟨⟩⟩52—CONTRACTS—FRAUD—MISTAKE—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to set aside certain contracts giving defendant an option to purchase an interest in certain properties and patents for the

⟨⟩⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

manufacture of fertilizer, *held* insufficient to show fraud or mistake in the execution of the contracts, where it appeared from the testimony of plaintiffs themselves that they were familiar with the contents of the contracts and understood the effect of same and their rights thereunder, and were not induced to sign by concealment, misrepresentation, or fraud, and that they were intelligent men of affairs, accustomed to large dealings, though the contracts were drawn up by defendant's attorney and plaintiffs were not represented by counsel.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. ☞52.]

4. CANCELLATION OF INSTRUMENTS ☞3—GROUNDS—CONTEMPORANEOUS PROMISE—FAILURE TO PERFORM.

Equity will not cancel a written contract for failure to perform a contemporaneous oral promise, except for fraud or mistake.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 1, 5; Dec. Dig. ☞3.]

5. PARTNERSHIP ☞20—EXISTENCE—OPTION.

Where the formation of a company to exploit water power to be used in manufacturing fertilizer and the purchase of patents covering the manufacture of fertilizer and certain property to be used in connection therewith were dependent on the exercise of an option given defendant by plaintiffs, which option was not exercised, and this was the sole relation existing between the parties, there was an absence of all elements essential to the existence of a partnership between them.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 6, 7; Dec. Dig. ☞20.]

6. TRUSTS ☞72—PAROL TRUST—CREATION.

That defendant, while holding an option to purchase from plaintiffs interests in certain properties to be used in connection with the manufacture of fertilizer and certain patents covering the manufacture of fertilizer, on which plaintiffs held an option, purchased from a third person water rights desirable for use in connection with the manufacture of the fertilizer and purchased certain of the patents from the patentee with the acquiescence of plaintiffs, did not create a parol trust in such purchases in favor of plaintiffs, where they contributed none of the purchase money and there was no fraud, misrepresentation, or concealment.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 102, 103; Dec. Dig. ☞72.]

Action by the Interstate Chemical Corporation and others against James B. Duke, praying that certain contracts be set aside and a trust be declared. Complaint dismissed.

See, also, 167 App. Div. 905, 151 N. Y. Supp. 1122.

Tomlinson, Coxe & Tomlinson (James A. O'Gorman, George W. Wickersham, and John C. Tomlinson, all of New York City, of counsel), for plaintiffs.

Krauthoff, Harmon & Mathewson, of New York City (Charles F. Brown, Z. V. Taylor, and Edward J. Patterson, all of New York City, of counsel), for defendant.

NEWBURGER, J. The complaint herein alleges: That the Interstate Chemical Corporation is a corporation organized and existing under the laws of the state of Virginia with an authorized and issued capital stock of $5,750,000 and a bonded indebtedness of $1,-500,000. That the said corporation owns and controls in the state

of Florida large mines of phosphate rock and owns, controls, and operates plants and factories in the cities of Charleston, Macon, Charlotte, Greenwood, and Tampa for the manufacture of commercial fertilizer and fertilizer material, and that said corporation is and has for a number of years last past been engaged in the manufacture and sale of such commercial fertilizer. That the plaintiff William B. Chisolm was and is the president of the Interstate Chemical Corporation, and that the plaintiffs Bryan and Tilghmans were directors, and that the said Chisolm, Bryan, and Tilghmans control the said corporation. That one Thomas L. Willson, a resident of the city of Ottawa, Dominion of Canada, secured, owned, and controlled a number of letters patent of the United States and Canada and applications for letters patent of the United States and Canada covering inventions made by him and by him and one M. M. Haff and by others relating to processes, methods, and devices to be used in the manufacture from phosphate rock of free phosphoric acid without the use of sulphuric acid, and also of commercial fertilizers containing some or all of the ingredients of ammonia or nitrogen and potash; and also had secured, owned, or controlled a number of letters patent and applications for letters patent upon said inventions filed and pending in Great Britain and other countries. That the said letters patent and pending applications for letters patent of the United States were owned by a corporation known as the Willson Laboratory Company, which company was owned and controlled by the said Willson, and he was able to contract for and on behalf of the same. That all of the other said letters patent and pending applications therefor were the personal property of the said Willson. That in the manufacture of fertilizers according to the Willson process very large and economic power is required. That the said Willson, prior to the 1st day of September, 1912, had secured and then owned or controlled certain real property and water rights and privileges in and about the Saguenay river, in the Dominion of Canada, upon which there was capable of being developed hydraulic power of approximately from 150,000 to 200,000 horse power. He also controlled water rights and privileges on the Shipshaw river, in the Dominion of Canada, a river flowing into and tributary to the Saguenay river, by reason of which there was capable of being developed hydraulic power of approximately 18,000 horse power, and referred to as the Shipshaw water power. That included in the said property controlled by Willson and adjacent to the water powers aforesaid were large factory sites, which in turn were in close proximity to deep and navigable waters. That the said Willson entered into negotiations with the plaintiff Chisolm, acting on behalf of himself and the other plaintiffs, which resulted in a contract bearing date the 21st day of September, 1912.

Said contract, after reciting the ownership by Willson of certain inventions heretofore referred to, and also the property of the plaintiffs, provides that the plaintiff Chisolm and his associates were to examine and verify all the laboratory work as far as they may deem necessary or desirable; that, after Willson had carried such experiments on as far as he might deem necessary or desirable, he was to

submit to the plaintiffs a detailed estimate, based upon the results obtained, of the cost of producing said material, together with the analysis of the same. Plaintiffs were then, two months from the date of the submission of such estimate and analysis, to express their determination to accept the terms of or withdraw from the agreement. If Chisolm and his associates accepted, he was to form a company, which was to take in the property of the plaintiffs as well as that of Willson, and that Willson was to be engaged at a salary of $25,000 per annum for a term of five years, and the plaintiffs agreed to advance to Willson on or before the 1st day of November, 1912, the sum of $150,000 as a loan for one year, with interest at 6 per cent. per annum. If the plaintiffs carried out the terms of this agreement, the said $150,000 should be applied as a part of the purchase money; in the event of their failure to do so, the said sum of $150,000 was to be repaid by Willson to the plaintiffs.

It further provided: That Chisolm was to form a company for the purpose of acquiring the rights of Willson and the assets of the Interstate Chemical Corporation. That said company was to pay Willson $650,000 in cash and $1,350,000 in stock or bonds of the company; to the Interstate Chemical Corporation $6,450,000, and to procure sufficient cash capital for the corporation to make these payments, as well as about $10,000,000 to cover the estimated cost of the development of the water powers and the erection of the necessary plants. That the plaintiffs upon the execution of the said contract between Willson and Chisolm caused to be made by experts employed by them an examination of the Willson process and of the Saguenay and Shipshaw water powers. That, in view of the large amount of money required for the development of the project referred to in the contract, the plaintiffs sought the co-operation of the defendant James B. Duke. That said Duke is a man of great wealth and large affairs, and controls and is able to secure large amounts of capital for enterprises or ventures in which he is interested. That in or about the month of September, 1912, plaintiffs entered into negotiations with the said Duke to secure his co-operation in the development of the water power and the manufacture of fertilizers, as provided by the Willson and Chisolm contract, and in securing the moneys required by the said Chisolm in the exercise of the option granted to him in the said contract of Willson. That they introduced said Duke to Willson, and fully explained and caused to be explained to him all the facts concerning the Willson process and the water powers, and of the properties and financial condition of the Interstate Chemical Corporation, and the large pecuniary advantage which they were satisfied could be realized by availing of the options granted in the Willson-Chisolm contract, and exhibited to said Duke said contract.

That the said Duke and the plaintiffs entered into the following oral agreement: The said Duke agreed that he would examine into the merits and practicability of said Willson process, Saguenay and Shipshaw water powers, and that he would examine or cause to be examined the factory sites owned and controlled by the said Willson adjacent to said water powers and the transportation facilities of said

sites. That he would examine the assets and mines and factories of the Interstate Chemical Corporation; and, finally, that if, as a result of such examinations, he should become satisfied of the practicability of the Willson process, and that large profits could be made by a corporation acquiring the inventions relating to that process, the water powers, and the assets of the Interstate Chemical Corporation, he would unite and co-operate with the said Chisolm and these plaintiffs in organizing the corporation provided for under the Willson-Chisolm contract, and acquire for it the properties aforesaid upon the terms and conditions stated in the said agreement; that he, said Duke, would subscribe, or cause to be subscribed, four-fifths of the money required. And it was agreed by these plaintiffs that they would subscribe, or cause to be subscribed, one-fifth of the said moneys, and that all profits made in the development of the enterprise should be divided between them in that proportion; that is to say, four-fifths to the said Duke, and one-fifth to these plaintiffs.

That said Duke, in or about the month of September, 1912, personally examined the water powers referred to, and was aided in such examination by his own experts and accountants and employés, and expressed himself to the plaintiffs and said Willson that said water powers were of great value, and that he was satisfied that the location of factory sites adjacent to said powers was favorable to cheap transportation of the rock and fertilizers which would be manufactured at said sites to points of distribution, and that the Willson process gave indication of commercial success. That said Duke, while examining the water powers aforesaid, learned that one J. B. Haggin owned certain real property rights and privileges immediately above the Saguenay water power, which are hereinafter referred to as the upper property, and by reason of said rights and privileges there existed a third water power which was capable of development, and he informed these plaintiffs that he deemed it necessary to negotiate for the purchase of the same in their joint interests and in the interest of said enterprise or venture, as in his judgment the Saguenay and Shipshaw water powers alone would not be sufficient to furnish the enormous amount of power which would be required for the manufacture of fertilizer according to the Willson process. That said Willson was entirely familiar with this property, and said Duke, with the consent and approval of plaintiffs, requested that negotiations be instituted for its purchase. That the plaintiffs requested the said Duke to advance to the said Willson the sum of $150,000, which, under the Willson-Chisolm contract, the said Chisolm had agreed to loan to said Willson. That said Duke, pursuant to said request, upon receiving the note of said Willson for the amount, dated November 1, 1912, payable one year from its date, and secured by the pledge of the title deeds of the Saguenay water power, loaned the said Willson the said sum, upon condition, however, that if the said Duke proceeded with the enterprise, the amount so advanced should be credited upon the purchase price of the Willson properties; if not, said note should be paid by Willson upon its maturity and provided, further, that the plaintiff the Interstate Chemical Corporation should guarantee the payment of said

note in the event that said Duke should elect not to proceed with said enterprise.

That one A. H. Burroughs is an attorney and counselor at law, and is employed by said Duke as his personal and confidential attorney and adviser, and is interested with said Duke in various enterprises. That said Burroughs participated in the investigations and negotiations here in referred to, and that as attorney for said Duke prepared all the contracts hereinafter mentioned, and that plaintiffs, during the entire negotiations were without any independent attorney, counsel, or advisers, and omitted to employ counsel, upon the representations and statements of the said Duke and the said Burroughs that it would not be necessary for them to go to the expense thereof, as the said Duke and these plaintiffs were, in effect, partners, and the said Burroughs would properly protect the interests of all concerned.

That on the 13th day of October, 1912, and after the enterprise or venture had been submitted by these plaintiffs to the said Duke, and the oral agreement made between them as aforesaid, and for the purpose of carrying out some of the matters so as aforesaid agreed upon, three certain contracts were executed by the parties.

A contract between Willson and Duke, dated October 12, 1912, and known as Exhibit B: After reciting Willson's ownership of water powers and of certain rights thereunder, it provided: That the said Duke proposes to form, and shall have the right to form or cause to be formed, within the year next ensuing from the date hereof, a corporation to be known as the New Company, under the laws of one of the states of the United States or Canada, or one of the provinces of Canada, or the United Kingdom of Great Britain and Ireland, with an authorized capital stock of $2,500,000, for the purpose, amongst other things, of acquiring and developing water power of the Saguenay river, and necessary lands, right to flood, and other property rights considered necessary or proper to the development and enjoyment of power on said river. That the said Duke proposes to have the upper property examined and to negotiate for the purchase of the same for and on behalf of the New Company. That said Duke shall have the exclusive right to make or direct said investigation and negotiations, and shall at his option and discretion purchase and acquire all or any part of the upper property, and at such price or prices as he may deem proper, or fail to acquire any part thereof. That said Willson, without compensation, shall assist in such negotiations. That said Willson gives and grants to the said Duke the right and option to purchase for and on behalf of the New Company the Willson property at any time within one year next ensuing, in consideration of $650,000 in cash, and the said Willson shall, upon the said Duke forming the New Company and so requesting the said Willson in writing, convey to the New Company by good and sufficient deed the Willson property, free from any lien or incumbrance, and the said Duke shall then cause the New Company to pay to said Willson in cash the sum of $650,000. The said Duke shall at the same time pay in cash towards the capital of the company the sum of $2,500,000. That the said Duke shall turn over to the New Company such portions of the upper property as he shall

have acquired, and the New Company shall refund to Duke the actual cost which he has borne.

This contract shall not be treated or considered as making it obligatory upon the said Duke to form the New Company, or to purchase, or cause the purchase by the New Company, if formed, the properties aforesaid, or either of them, or any part thereof; but as respects each of these things, he is to be free to do as he may elect after he has made further investigation.

It further provided that the Interstate Chemical Corporation has an option affecting the Willson property. It is to the interest of the latter company that this contract be made, and it, therefore, to the extent only that it is necessary to the fulfillment of this contract by the said Willson, waives its right and releases said option and gives its consent to the said Willson giving and granting to the said Duke the options herein expressed in his favor, all of which is evidenced by the Interstate Chemical Corporation causing its name to be hereunto signed by its proper officer.

This agreement was executed and signed by Willson, Duke, and the Interstate Chemical Corporation by Chisolm, its president.

The second agreement, entered into on the 12th day of October, 1912, was between the Interstate Chemical Corporation, the plaintiffs Chisolm, Bryan, and Tilghmans as parties of the first and second parts, and the defendant Duke, party of the third part. After referring to the assets and liabilities of the Interstate Chemical Corporation and the interest which the chemical company has in the Willson process and the water powers, it provides that the chemical company at its own cost will proceed with the establishment of a plant at and in connection with its fertilizer plant at Charlotte, N. C., for the purpose of manufacturing on a commercial scale ammoniated double superphosphate in accordance with the Willson process and patents, and shall complete said plant as soon as practicable and fully demonstrate on a commercial scale the efficiency of the Willson patents and process; and that Duke shall put at the disposal of the chemical company without cost to it (but in the event the options herein specified are exercised by the said J. B. Duke and the New Company is formed, then the said power to be paid for by the New Company at the rate of one-half of one cent per k. w. hour) electric current not exceeding 2,500 horse power, as said power may be desired, under the same conditions the Southern Power Company furnishes power to its customers under its secondary contract, for one year from the date hereof, but no longer. And after providing that Duke shall have access to the experimental plant it provides:

And in the event the said J. B. Duke shall be satisfied with the operation of said plant and the efficiency of said process he shall, at any time within six months from the date of such satisfactory test, have the right to form, or cause to be formed, a company for the purchase and acquisition of the Willson properties and patents and the stock of the plaintiffs in the chemical company.

That the New Company is to be formed under the laws of such state, province or country, and with such authorized capital stock as Duke may desire, and he shall subscribe $8,000,000 of stock of the New Company and the plaintiffs $2,000,000 of stock, the chemical company to assign all its interest in the Willson process, and shall receive therefor $850,000 of stock of the New Company, for the Shipshaw property $500,000 of stock, and for the factories and land of the chemical company stock for whatever amount said property of the chemical company shall be found to be worth after an appraisal.

It further provides that the chemical company shall, in the event the said J. B. Duke upon the demonstration of the Willson process decides to avail himself of the aforesaid option, afford to the said Duke every opportunity for the examination of the property and books of the said chemical company.

It then provides that:

The said J. B. Duke shall be entirely free not to avail himself of the foregoing option if the test of the Willson process aforesaid shall not be satisfactory to him, or the protection secured by the patents aforesaid, or the title to any of the properties aforesaid shall not be satisfactory, or for any other cause, and in the event of his refusing, declining, or failing for any cause to exercise said option and form or cause to be formed the New Company, no liability whatever shall rest upon him.

After reciting the interests of the Willson Carbide Company, the Willson Laboratory Company, and the said Willson, it further provides:

6. The said J. B. Duke has entered into a contract with the said Thomas L. Willson (hereinafter called "the Willson Contract"), bearing even date herewith, the terms of which contract are familiar to the parties hereto, which contract, amongst other things, gives to the said J. B. Duke the right to form a company (called therein "the New Company") for the acquisition of water power and water power rights on the Saguenay river, in the province of Quebec, Canada. In the event the said J. B. Duke exercises the options in his favor, as provided by these presents, it is the intention of the parties hereto that the property thereby acquired, or the right to which is thereby acquired, shall be combined under a common ownership with the property of the New Company contemplated to be formed under and in pursuance of the Willson contract. This may be accomplished by either treating the latter company as the New Company contemplated to be formed in pursuance of these presents, and having the conveyances and deliveries contemplated herein made to the said company contemplated by the Willson contract, and increasing the authorized capital stock of that company accordingly, and having the stock of that company issued and delivered in consideration of same, or by forming a separate company and each of the new companies aforesaid (the one contemplated by the Willson contract and the one contemplated by this contract) convey and assign all their respective properties and assets of every description to the said separate company, and in the event the said J. B. Duke exercises the options herein contained as aforesaid, the same shall be accomplished in one or other of the ways aforesaid, it being left to the discretion and option of the said J. B. Duke to determine in which way the same shall be accomplished, and, in the event a separate company is formed, to supervise and direct the forming of the same.

On the said 12th day of October, 1912, the third contract was entered into between the plaintiff Chisolm, as party of the first part, Willson of the second part, and the Interstate Chemical Corporation of the third part.

After referring to the Chisolm-Willson contract of September 17, 1912, and the contract between Willson and Duke of the 12th day of October, 1912, and the contract between the plaintiffs Willson and Duke of the 12th day of October, 1912, it uses the following language:

There was granted to said Duke certain options respecting the property mentioned in said first agreement (meaning the Chisolm-Willson agreement), and which agreement, if fully kept and performed by the parties thereto (referring to the agreement with Duke), it is intended shall supersede and take the place of the said first above-mentioned agreement (referring to the Willson-Chisolm agreement).

It then recites that, in order that there should be no misunderstanding respecting the said agreements, it is agreed that Chisolm and Willson assign to the chemical company all the right, title, and interest that they have in the Chisolm-Willson contract to the said chemical company, and further agreed that if the contract entered into on the 12th day of October, 1912, between the plaintiffs Willson and Duke shall be fully kept and performed by the parties herein named, then the agreement dated September 17, 1912 (Chisolm-Willson agreement), should become inoperative, null, and void, and of no effect, and the same shall be canceled. If the agreement shall not be fully kept and performed as provided in the agreement of October 12, 1912, and made between the plaintiffs Willson and Duke, then, in that event, the agreement of September 17, 1912 (Willson-Chisolm agreement) shall become operative and in full force.

The complaint further alleges that the said contracts were prepared by Burroughs, as attorney for the defendant Duke, without consultation with these plaintiffs and Willson, and that said plaintiffs and Willson and the companies he represented were without counsel, and that said contracts as prepared were submitted to these plaintiffs and Willson by Burroughs in their present form, without opportunity for correction, and were executed by each and all the parties to them upon the request of Duke and the said Burroughs, and wholly in reliance and upon their statement and representation that the said contracts were proper to be entered into in furtherance of the general enterprise aforesaid, and in furtherance of the said oral agreement existing between these plaintiffs and the defendant.

The complaint then alleges the effect of the agreements and contracts between the parties upon the enterprise and as to the duties that were thus imposed both on the plaintiffs and the defendant, and as to the effect of the different contracts entered into on October 12th, and that the contracts between the parties existing in the month of October, 1912, did not embody all of the agreements heretofore entered into. That pursuant to the agreement the plaintiffs erected and equipped a plant at Charlotte, N. C., and conducted therein, at their own cost, commercial tests of the Willson process, which tests cost these plaintiffs approximately $100,000, and that Duke and the experts employed by him had access to said tests, and that the demonstrations were actually conducted under the direction and supervision of the experts employed by said Duke. That during the progress of said tests Duke informed the plaintiffs that he was so satisfied with the result of the tests that he purchased the upper property from J. B. Haggin and paid therefor, as the plaintiffs are informed, the sum of $1,650,-000 for the benefit of the New Company. That on the 21st day of January, 1914, the tests were fully met, and that at the plant at Charlotte there was produced under the Willson process commercially 3.70 of free phosphoric acid per horse power per 24 hours. That in or about the month of October, 1913, Willson became financially embarrassed, and that said Willson and Duke entered into an agreement, bearing date the 1st day of November, 1913, and known as "Exhibit E," which, after reciting that Willson, on the 12th day of October,

among other things, had given an option to Duke to purchase the Saguenay water power, and had borrowed from Duke the sum of $150,-000, the payment of which said Willson desired to be extended, and also referring to the contracts between said Willson and the Interstate Chemical Corporation, then provides that the option given by Willson to Duke to purchase water powers and rights, as specified in the several agreements, is extended and continued until the option given by the Interstate Chemical Corporation shall terminate and expire, and that Duke is given the right to exercise and take over the Saguenay water power as specified in the option heretofore given, upon payment of $150,000 therefor, instead of $650,000 as prescribed in said option; said reduction being granted, among other things, by reason of the fact that the representations made by Willson regarding said water power were inaccurate. That Duke shall not exercise said option unless he also exercises his option to purchase the property described in said contract and option made by plaintiffs Interstate Chemical Corporation, Willson, and Duke, and, if said Duke exercises his right to purchase, then the consideration payable for the Willson patents and other rights shall be $400,000 cash and $450,000 par value stock of the New Company, instead of $850,000 specified in the option and contract. This agreement is signed by Willson, Duke, the Interstate Chemical Corporation, by its president, the Willson corporations by their presidents, Chisolm, Bryan, the two Tilghmans and Little, individually.

The complaint further alleges: That Duke, in furtherance of his plan to defraud these plaintiffs, falsely and fraudulently represented to them that he was induced to purchase the properties of Willson, not only by reason of the saving in price that could be made, but because he feared that if said Willson was compelled to make any assignments or go into bankruptcy, or receivers of his property were appointed, the whole enterprise would be seriously embarrassed, which would be injurious to the plaintiffs as well as the defendant. That the plaintiffs believing the said representations and in the truth of the statements aforesaid, and relying thereupon, entered into agreements on the 14th day of November, 1913, and which are known as "Exhibit F," of November 15, and "Exhibit G," of the same date. That said agreements were prepared by said Burroughs, the attorney of the defendant Duke, were sent to the plaintiffs with a request that they attend the meeting at the office of Duke on the following day to execute the same. That when they met on the 15th day of November, 1913, at the office of Duke, they objected to the agreement known as "Exhibit G" as not being clear and failing to contain all of the agreements between the parties. That thereupon the said Duke falsely and fraudulently stated to these plaintiffs that he was acting in good faith, and that notwithstanding the provisions of the said contracts he intended to proceed with the said enterprise, and that if the plaintiffs would execute the contract of November 15th, and known as "Exhibit H," he would proceed with the enterprise and organize the New Company; that he had no time to bother about the phraseology of the contracts or have them redrawn; and that they would be perfectly safe in

signing the same. That said Burroughs also stated that plaintiffs could sign the contracts and rely upon the statements of Duke.

Exhibit G, of November 15th, was entered into between the Interstate Chemical Corporation, Chisolm, Bryan, the two Tilghmans on the one hand, and the defendant Duke on the other. This contract, after reciting the assets and liabilities of the chemical company and the contract between Willson, Haff, and Duke for the purchase by Duke of the patents and property owned by Willson, Haff, Willson Carbide Company, Willson Laboratory Company, and Henry A. Little, provides that the chemical company shall continue its efforts to demonstrate the practicability of the Willson process, and that Duke shall continue to put at the disposal of the chemical company the necessary electric power.

And in the event that Duke shall be satisfied with the operation of said plant and the efficiency of the processes, he may, at any time within six months from the date of such satisfactory test, have the right to form or cause to be formed the New Company, for the purchase of the Saguenay property, the Carbide property, the Willson patents, the Willson Laboratory patents, and the stock of the individual plaintiffs herein, being a majority of the stock of the chemical company.

The agreement then provides for the capital of the New Company and for the conveying to it of the interests of the plaintiffs as well as the defendant Duke in the water power and the chemical company, and for the necessary examination of the books and papers of the chemical company and of the patents and titles. It further provides that:

If Duke shall in his discretion exercise or fail to exercise the foregoing option, regardless of the success of the test of the Willson process aforesaid, and in the event of his refusing, declining or failing for any cause to exercise said option, and form or cause to be formed the New Company, no liability whatever shall rest upon him; he shall in no event be obliged to exercise said option or form the New Company unless he shall in writing addressed to the chemical company specifically indicate that he desires to do the same. In the event the said Duke shall fail to exercise the option and form said New Company and the chemical company shall desire to continue said experiments, it shall have the right to do so, and Duke shall furnish electric current for that purpose free of charge for a period not exceeding six months from the date that Duke shall in writing have declined to exercise the said option in his favor. And if the chemical company during the six months aforesaid becomes satisfied of the efficiency of the Willson process, it may form the New Company, and Duke gives unto the chemical company the right to purchase and pay for within six months the properties sold to him by Willson, the Carbide Company, the Laboratory Company and Haff to the extent that he shall have acquired title to the same in consideration of $650,000 cash and $1,350,-000 in stock of the New Company.

Agreement H. referred to in the complaint, is the agreement between Willson, Haff, Carbide Company, Laboratory Company, Little, and Duke, and provides for the purchase by Duke of the Willson patents and processes and the Saguenay properties.

The complaint further alleges that after the execution of these contracts of November 15, 1913, the plaintiffs proceeded with the tests and demonstration at their own cost and expense, which tests were wholly successful, and that Duke was informed thereof, but that he utterly refused to proceed with the enterprise; that while pretending

not to be satisfied with the results Duke has, in fact, acquired all the patents, processes, and property for himself, and is arranging to construct plants and carry on the same for his own benefit.

The prayer for relief in the complaint asks that the contracts of November 15, 1913, be set aside as against the plaintiffs, and that this court declare a constructive trust against the defendant Duke in favor of the plaintiffs to the extent of one-fifth interest in all the properties heretofore referred to, and for specific performance against said Duke, requiring him to form the corporation referred to in the contracts, and that he subscribe the amounts provided in said contracts towards the capital stock of said corporation.

The answer of the defendant Duke, after admitting the introduction to him of Willson by the plaintiffs, and the signing of the several contracts alleged in the complaint, and that Burroughs was his counsel and had been employed by him, and of an investigation of the several properties by him, denies that any oral agreement ever existed between him and the plaintiffs or any of them, but admits that the chemical company experimented with the Willson process, but denies that the same was done in pursuance of any oral agreement, and alleges that whatever agreements were made between him and the plaintiffs or any of the parties were entirely reduced to and expressed in the written instruments, and that the same were drawn and executed after a full discussion between the parties, and that the oral contracts set out in the complaint, by reason of the statutes of the several states of the United States and the Dominion of Canada, were void and unenforceable at law or in equity.

[1] On the trial the plaintiffs all testified that the oral agreement sought to be enforced in this action was entered into on the trip made by the parties to Ottawa and the Saguenay river, which, it is conceded, was in or about the month of September, 1912, prior to the written contracts between the plaintiffs and the defendant. At that time plaintiffs were the owners of certain manufacturing plants in the South, and of phosphate mines in the state of Florida, while Willson owned or controlled certain patents, processes, and water rights. The contention of the plaintiffs that they had obtained control of what they regarded as properties of great value when they secured the Chisolm-Willson contract is not borne out by the terms of the contract. Under this contract, which was entered into the 21st day of September, 1912, and prior to the written contracts between plaintiffs and defendant, Chisolm was given the privilege or option, within two months after the submission by Willson of the result of certain tests, to form a company which was to take over the properties of the plaintiffs and of Willson. Plaintiffs therefore had no title in Willson patents or water rights, but simply an option to form a company to take over the properties heretofore referred to. The title remained in Willson until the formation of the company and the payment to him of the amounts referred to in the contract. Under the written contracts between plaintiffs and defendant, and referred to as Exhibits B, C, E, F, and G, not only the word "option" appears, but the expression is found repeated in every one of the exhibits:

"That the said Duke shall be entirely free not to avail himself of the foregoing option if the test of the Willson contract shall not be satisfactory to him."

So that it is apparent from a reading of this agreement Duke was the sole arbiter of·whether he would proceed with the process or not. The letter from the plaintiffs to Duke, dated January 23, 1914, in which, after referring to the agreement of November 15, 1913, and to the tests made at Charlotte, of the result they say:

"We beg, therefore, to submit the demonstration to you and ask if you are satisfied with the efficiency of the process and desire to exercise the option in your favor given under the terms of the said agreement."

And the reply of Duke, dated January 26, 1914, abandoning the option and declining to form the New Company as provided in the contract of November 15, 1913, clearly demonstrates that the plaintiffs and defendant knew of their rights under the contracts and of the position occupied towards each other.

[2] Mr. Justice Vann, in Benedict v. Pincus, 191 N. Y. 382, 84 N. E. 286, says:

"An 'option' is an exclusive privilege to buy, and a 'contract for an option' is the agreement by which the privilege is created. Sometimes it is defined as a continuing offer, binding for the time specified the one who makes it, but not the one to whom it is made, unless he accepts when it becomes binding upon both. It neither transfers, nor agrees to transfer, title to property, but confers the bare right to accept an offer within the time limited and upon the terms provided. No obligation is assumed by the holder of an option, and no promise is made in the contract therefor except by the one making the offer or granting the privilege and the words used are wholly his own."

[3] But the plaintiffs claim that the written contracts are ambiguous, were obtained by fraud, and did not represent the agreement between the parties. And it is claimed that at the time of the execution of the agreement G, of November 15, 1913, between the plaintiffs and the defendant Duke, the defendant and his counsel made certain statements that induced the plaintiffs to sign the same, and, as they were not represented by counsel and acting upon such statements, the agreement of November 15th should be treated as a nullity as not containing the oral agreement between the parties. Chisolm testified (sten. min., pp. 85, 86½, 146, 182) that he had the contracts the night before, and that when he and his associates went over for the signatures the next day, November 15th, he said he would not sign the contracts, that they did not embody the original contract and did not cover the situation at all as it was covered in the original contract, it was an entirely different set of contracts. Mr. Bryan got up and said to Mr. Duke:

"Why, under these contracts we had got nothing; you have got everything, the water power, the patents, the processes and all that, and we haven't a single thing."

Bryan further said:

"Under this contract we were to make the demonstration a success and that Duke need not go on; he had the privilege of going on or not even after that, and he said this is entirely changed. Originally you were to put up eight

million and we were to put up two million; now we have got to put up the whole ten million under this contract. What you paid $377,000 for we are asked to pay $2,000,000."

To which Duke replied:

"That these contracts were practically the same as the original contracts of October 12th, only he was to be substituted in place of Willson, and that the contract was drawn fairly for all of us, and that it was his intention, if we went to Charlotte and on a test demonstrated the 3.70 phosphoric acid, that he would go on with the business."

Chisolm on cross-examination testified: That he knew what was in the contracts. Bryan testified that on the 14th day of November, the parties met at Duke's or Burroughs' office, and Judge Burroughs had there prepared these agreements, and they were read to the plaintiffs, who said they would like to take these agreements home and look them over, and the plaintiffs were given copies of them. That on the 15th day of November he (Bryan), in company of Chisolm and the two Tilghmans, went to Judge Burroughs' office and there met the defendant Duke, Judge Burroughs, and Mr. Lee. That Judge Burroughs said:

"I hope you gentlemen have read the contracts overnight and understand and approve them."

To which he (Bryan) said:

"Yes, we have read them, but we don't see that there is anything in them for us; we understood that this contract was to be a duplicate of the contract in many details at least, of October 12, 1912, but in this contract Mr. Duke is not obligated to go on in any way whether the process is satisfactory or is not, and in addition he gives us an option, in the event of his not going on, whereby we can buy from him for $2,000,000 for what he paid Willson $377,000 for. In addition to that, there is no optional privilege on our part for acquiring Upper Saguenay, which, as you know, is really the key to the development to the whole of this power, and in addition to that Duke has put on us an obligation to raise the $10,000,000 capital. Now, I said, you might as well make that $25,000,000; we cannot raise $10,000,000 and go on with this business after Duke had turned us down."

It is apparent, therefore, from the testimony of the plaintiffs, that they were familiar, not only with the contents of the agreements of November 15th and all prior agreements, but understood the effect of the same and their rights thereunder. Where was there any concealment, representation, or fraud that induced the plaintiffs to sign these agreements? The plaintiffs are intelligent men of affairs, accustomed to large dealings. They knew the provisions of the agreement between them and Duke. They had ample time to study the contents and the effect of the same on whatever rights they possessed, as their testimony of what took place clearly shows.

[4] It is a well-settled rule in this state that fraud cannot be presumed of a promise not performed, and that a court of equity will not reform or cancel an agreement except for fraud or mistake. In Wilson v. Deen, 74 N. Y. at page 534, it was said:

"We think it impossible to sustain these conclusions without disregarding the established rule of law that a written contract merges all prior and contemporaneous negotiations and oral promises, in reference to the same subject, and that, when the terms of a lease are in writing, the rights and du-

156 N.Y.S.—17

ties of the parties depend upon the terms or legal intendment of the lease itself, or, as otherwise expressed, that it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, are embraced in the writing. This rule has been repeatedly applied to cases like the present, where tenants have set up oral agreements or promises alleged to have been made by the landlord, at the time of, or before, the execution of the lease, and as an inducement thereto. The alleged promises have in most of the cases been to put the premises in repair, but they have uniformly been held to have been merged in the lease. Cleves v. Willoughby, 7 Hill, 83; Speckels v. Sax, 1 E. D. Smith, 253; Howard v. Thomas, 12 Ohio St. 201; Brigham v. Rogers, 17 Mass. 571. See, also, Renard v. Sampson, 12 N. Y. 561; Ruse v. Mutual Ben. Life Ins. Co., 23 N. Y. 516; Johnson v. Oppenheim, 55 N. Y. 293.

"The rule is the same in equity as at common law, and although, in equity, a written contract may be set aside or reformed, for fraud or mistake, it cannot be controlled by evidence that it was executed on the faith of a contemporaneous or preceding oral stipulation not embraced in it, nor can it be set aside on the ground that such oral stipulation has not been performed, unless it is also shown that the stipulation has been omitted by mistake. We have examined the case with care, for the purpose of ascertaining whether it contains the necessary facts to enable the court to grant relief, under its power to reform or set aside written instruments for fraud or mistake; but we have failed to find any evidence of mistake or fraud which would justify the exercise of that jurisdiction. The testimony shows that the plaintiffs read the lease and knew its contents, and knew that it contained no covenant to put in more furniture than was already in the house, and knew that the furniture, which, they say, the defendant had promised to put in, had not all been put in. They testify that when the lease was signed the defendant again promised to complete the furniture and the surety asked the lessee whether she was willing to sign the lease, on the faith of the defendant's promise to put in the furniture, and she said she was, and it was then signed by all the parties, each taking one of the counterparts. These facts do not bring the case within the jurisdiction of a court of equity to reform or cancel the instrument. That jurisdiction is exercised under the head of fraud or mistake, and the mistake or fraud must be shown, as well as the agreement. Stevens v. Cooper, 1 Johns. Ch. 425 [7 Am. Dec. 499]; Lord Inham v. Child, 1 Bro. Ch. R. 92; Lord Portmore v. Morris, 2 Bro. Ch. R. 219; Dwight v. Pomeroy, 17 Mass. 303 [9 Am. Dec. 148]; Towner v. Lucas' Ex'rs, 13 Grat. [Va.] 705. Where there is no fraud or mistake in the preparation of the instrument, and it appears that the party knew its effect and purport, there is no ground for the reform of the contract, and a contemporaneous promise on the faith of which he signed cannot be given in evidence to control it."

[5] But it is contended by plaintiffs that, if there be no fraud or mistake in the execution of the agreement, there was fraud on the part of the defendant towards the plaintiffs, as they were partners in the enterprise contemplated. I have searched in vain the agreements between the parties, the testimony, and the very voluminous briefs, and have failed to find a single element that would constitute a partnership in a joint enterprise. On the contrary, the formation of the company to exploit the water power in Canada and the purchase of the patents of Willson and the property of the plaintiffs was dependent on the exercise of the option on the part of the defendant, and until the defendant exercised the rights given him under said option the relation of partners did not exist.

Schantz v. Oakman et al., 163 N. Y. 148, 57 N. E. 288, was an action for an accounting. The complaint alleged that the plaintiff, possessing an option for the purchase of the majority of the capital stock of certain street railway companies, entered into an agreement with

defendants, who held a majority of the capital stock of another street railway company, to form a new company. The provisions of the agreement, among other things, provided that certain things were to be done on the formation of the new company. The complaint then alleges that while arrangements were in progress by the plaintiff the defendants entered into a combination for the purchase of said railways in violation of the agreement with the plaintiff, and by said acts have deprived plaintiff of his rights under his agreement with the defendants. The court held that, the new corporation provided in the agreement never having been formed, no relation of partnership was created; that all it showed was that the parties united in a scheme for the purpose of accomplishing something in the future, the formation of a consolidated company, in which event the plaintiff would become entitled to a proportion of the capital stock; and that if plaintiff had any remedy it was by way of an action at law for any damages which he might be able to prove to have been occasioned through a breach of the agreement, and was not entitled to equitable relief.

[6] But it is further contended by plaintiffs that whatever rights were obtained by the defendant Duke under the Willson or Haggin contracts or purchases inured to their benefit, and that the same should be decreed to be held by the defendant in trust for their benefit. All the elements necessary to create a parol trust are wanting.

As was said by Chief Justice Cullen in Leary v. Corvin, 181 N. Y. at page 227, 73 N. E. at page 985, 106 Am. St. Rep. 542, 2 Ann. Cas. 664:

"Now, while that rule is as stated, that a trust results in favor of the person paying the consideration for a conveyance, it is the settled law that to bring a case within the rule the payment must be either of the whole consideration or of some aliquot part thereof, or for the value of some particular estate in the premises conveyed. The authorities to this effect are uniform. White v. Carpenter, 2 Paige, 217; Sayre v. Townsend, 15 Wend. 647; McGowan v. McGowan, 14 Gray [Mass.] 119 [74 Am. Dec. 668]; Wheeler v. Kirtland, 23 N. J. Eq. 22; Perry v. McHenry, 13 Ill. 277; Baker v. Vining, 30 Me. 121 [50 Am. Dec. 617]; Brown on Frauds, § 86. As is held in all these cases, 'a general contribution of a sum of money towards the entire purchase is not sufficient,' and this is the doctrine of the latest decision of this court on the subject in Schierloh v. Schierloh, 148 N. Y. 103 [42 N. E. 409]."

See, also, Wheeler v. Reynolds, 66 N. Y. 234; Sturtevant v. Sturtevant, 20 N. Y. 39, 75 Am. Dec. 371; Levy v. Brush, 45 N. Y. 589; Lathrop v. Hoyt, 7 Barb. 59; 2 Story's Equity, 1201a.

Nor is there any evidence of any fraud, misrepresentation, or concealment which would warrant this court impressing a constructive trust upon the property held by the defendant.

The provision in the agreements that Duke should have the right to form the company if he shall be satisfied with the efficiency of the Willson process gave him the sole right to determine whether the tests were satisfactory to him. Brown v. Retsof Mining Co., 127 App. Div. 368, 111 N. Y. Supp. 594, and cases there cited; Crawford v. Mail & Express Publishing Co., 163 N. Y. 404, 57 N. E. 616.

For the reasons heretofore stated, the complaint must be dismissed on the merits. Submit findings and decree.