# COURT OF GENERAL SESSIONS — NEW YORK COUNTY.

## August, 1916.

## THE PEOPLE v. ROBERT P. LEVIS and FREDERICK W. WAKEFIELD.

### (96 Misc. 513.)

INDICTMENT—WHEN EXISTENCE OF, MUST BE ESTABLISHED—EVIDENCE—
WHEN MOTION TO DISMISS INDICTMENT GRANTED—GRAND JURY.

The existence of an indictment, which is a public record, must be established by competent proof and not by inferior and secondary evidence.

Parol evidence of the contents of an indictment cannot be received, but the clerk of the court who is the custodian of its records should be called to produce the indictment itself.

Defendant by indictment was charged with conspiring to prevent the due course of law and justice, and illegally and fraudulently to compound the crime of grand larceny in the second degree, for which one M. was under indictment, and to delay prosecution therefor, and to withhold evidence thereof, and illegally and fraudulently to cause books to be concealed and withheld from the district attorney, the entries therein being material evidence upon the trial of M. On motion to dismiss the indictment upon the ground, first, that it clearly appeared from the minutes of the grand jury that there was not sufficient legal evidence to support the indictment, and, second, that illegal and incompetent testimony prejudicial to the constitutional rights of defendant was received, it appearing that the only evidence presented to the grand jury that an indictment was pending against M. was the testimony of an assistant district attorney who gave parol evidence on the question; held, that such testimony was clearly hearsay and that the clerk of the court should have been called to produce the indictment.

The indictment against defendant alleged the organization and existence of a domestic corporation and that one M. was a stockholder in and treasurer thereof; that the business of said corporation was

managed and controlled by him and one J.; that certain entries in the books of said corporation had been introduced in evidence before the grand jury which returned the indictment against M. and that said entries in said books afforded competent and material evidence of the guilt of M. and were essential to the successful prosecution of the indictment against him. There was not an item of testimony to show to the grand jury that said book entries were legal and competent evidence against M.; they could not be introduced in evidence against M. on his trial unless it was shown that he had made the entries in the books, or that he had knowledge of the contents of the books or some connection with the entries therein, but no such evidence was given before the grand jury. *Held,* that the proceedings against defendant having been begun with illegal and prejudicial testimony given by an assistant district attorney and throughout the case incompetent and highly prejudicial evidence was constantly received and submitted to the grand jury with a denunciation of defendants as a " bunch of crooks," the motion to dismiss the indictment will be granted, with leave to the district attorney to resubmit the matter to the same grand jury.

District attorneys in presenting cases to the grand jury should keep in mind that they owe a duty to persons charged with crime and that only legal evidence should be presented for the consideration of that body.

MOTION to dismiss an indictment.

*Joseph M. Proskauer,* for defendant Levis.

*Leslie J. Tompkins, Assistant District Attorney,* for People.

MULQUEEN, J. :

This is a motion to dismiss an indictment charging Robert P. Levis with the crime of conspiring to prevent the due course of law and justice and illegally and fraudulently to compound the crime of grand larceny in the second degree, for which one Joseph S. Mack was under indictment, and to delay the prosecution therefor, and to withhold evidence thereof, and illegally and fraudulently to cause books to be concealed and withheld from the district attorney of the county of New York,

9

the entries thereof being material evidence upon the trial of said Mack.

The defendant is a practicing attorney of this county, and in his own behalf he made a motion for an inspection of the minutes of the grand jury which returned the indictment against him. That motion was granted and he now moves to dismiss the indictment on the grounds, among others: First, that it clearly appears from the minutes that there was not sufficient legal evidence to support the indictment; and, second, that illegal and incompetent testimony, highly prejudicial in its nature, was received by the grand jury in violation of his constitutional rights.

In order to sustain this indictment is must be established, *first,* that an indictment was pending against one Joseph S. Mack for the crime of grand larceny in the second degree; *secondly,* that certain books of the corporation known as the Jackson-Mack Company contained competent and material evidence on which the district attorney relied to aid in the prosecution of the said indictment against the said Mack, and, *thirdly,* that a conspiracy was formed to defeat the prosecution of Mack by suppressing and destroying that evidence.

It is claimed by the defendant that there is not a scintilla of legal proof that an indictment was pending against Mack. An examination of the minutes discloses that the only testimony on this point was given by Assistant District Attorney O'Malley, who was called as the first witness before the grand jury and who gave parol evidence on this question. He testified that on the 28th of May, 1913, an indictment was returned by the grand jury of this county charging the defendant Mack with the crime of grand larceny in the second degree, "in that he gave a false financial statement" and "procured property on the credit of that statement." This testimony is clearly hearsay. Parol evidence of the contents of a public record cannot be received. The clerk of the court should have been called

upon to produce the indictment. He is the custodian of the
court records, and if such an indictment in fact existed it
could easily have been produced and proved. Its existence
cannot be inferred, but must be established by competent
proof and not by inferior and secondary evidence. (McVity
v. Stanton, 10 Misc. Rep. 105; Newcomb v. Griswold, 24 N. Y.
298; People v. Cardillo, 207 id. 70; Duffy v. Beirne, 30 App.
Div. 384.)

In the indictment against Levis it is alleged that the Jackson-
Mack Manufacturing Company was a corporation organized
and existing under the laws of the State of New York, and that
one Joseph S. Mack was a stockholder in, and the treasurer
of, said corporation; that the business of the said corporation
was managed and controlled by him and one Salo J. Jackson;
that certain entries in the books of the said Jackson-Mack
Manufacturing Company had been introduced in evidence be-
fore the grand jury which returned the indictment against
Mack, and that the said entries in said books afforded compe-
tent and material evidence of the guilt of said Mack and were
essential to the successful prosecution of the said indictment
against him.

There is not an item of testimony to show that these book
entries were legal and competent evidence against the said Mack.
They were contained in the books of a corporation and could
not be introduced in evidence against Mack on his trial, unless
it was shown that he had made the entries in the books, or
that he had knowledge of the contents of the books, or some
conection with the entries therein.

In People v. Burnham (119 App. Div. 302, 313, 21 N. Y.
Crim. 192), the court said: " There was also evidence admitted
against the objection and exception of the defendant in relation
to the entry in the books of the corporation respecting this
payment, which was incompetent as against this defendant. He
was not shown to have had anything to do with these books, or

any knowledge of their contents, or any connection with the entries. In the absence of evidence of such knowledge or connection with the entries the books of a corporation are not evidence against an officer of the corporation in a criminal prosecution. (Rudd v. Robinson, 126 N. Y. 113.)"

This doctrine was reaffirmed by the court on a motion for a reargument. (People v. Burnham, 120 App. Div. 388.)

In Rudd v. Robinson (126 N. Y. 113, 117), the court said: "There was no proof that the defendant had actual knowledge of the entries contained in the books which were used as evidence against him, or that he authorized such entries or caused them to be made. There was no proof from which the law would raise a legal presumption that he had knowledge of the entries unless he is chargeable with such knowledge from the mere fact that he was a stockholder and trustee of the corporation.

"There is no rule of law which charges a director or stockholder of a corporation with actual knowledge of its business transactions merely because he is such director or stockholder. * * *

"We have not been able, after a careful examination of the authorities cited by the counsel for the plaintiff, and many others, to find any case in which it has been decided that the books of account of a corporation are competent evidence, of themselves, to establish an account or claim against a trustee or stockholder in an action brought in behalf of the corporation; and it has been repeatedly said by judges and text writers that they are not competent for that purpose."

It is therefore clear that the mere introduction of these books to the grand jury was not sufficient in itself to prove that they were material and competent evidence against Mack on the indictment which had been filed against him. On the contrary, the cases cited firmly establish the doctrine that evidence of knowledge or connection with the entries was required to

render these books admissible against the defendant Mack. But the minutes of the grand jury in the case before me do not contain a single item of such evidence.

To sustain the allegation of the indictment that the defendant Levis entered into the conspiracy to obstruct and defeat justice, the People called many witnesses, among others, William Carroll Low, an attorney of New York City, counsel for Joseph S. Mack; John M. Mack, a brother of Joseph S. Mack; and Milton A. Kleinberger, an alleged co-conspirator, who was not indicted. These three witnesses testified that the conspiracy was begun on the 31st of March, 1915, at a dinner in the Hotel Claridge, New York county, at which the only persons present were these three witnesses and the defendants Levis and Wakefield.

John M. Mack, a resident of Allentown, Penn., testified that he came to New York in the interest of his brother; that one Louis Frank, of Allentown, told him that Mr. Kleinberger would be the proper man to get the creditors together and talk the matter over in his brother's behalf over whom an indictment was hanging; that Frank took him to Kleinberger's office and introduced him to the latter, and that he said to him, "Mr. Kleinberger, what I want to do, I want to get the creditors to New York and I want to have a personal talk with them and the attorneys representing them and see if we can't get the indictment dismissed." He told Kleinberger to invite Wakefield and Levis to meet them at dinner; he said that Low wished to attend as the attorney of Joseph S. Mack; that they met at dinner and the affairs of Joseph S. Mack, the Jackson-Mack Company, and the attitude of the creditors were discussed.

Mack and Low testified that at the conclusion of the dinner the defendant Levis and the witness Low had a conversation separate and apart from the others which was not overheard by any of the others. According to Low, Levis then said to him: "' The indictment against your client here, Joseph Mack,

is for making a false statement — a false financial statement
— and the district attorney, in order to prove that statement,.
will have to have the books of the Jackson-Mack Company.
Why wouldn't it serve your purpose just as well as getting
the creditors together to have the books of that company?' I
said that was a new proposition to me and I suppose the district
attorney has the books. He said, ' No, Wakefield has the books,
and in the ordinary course of business they will be sold and
we can arrange to turn them over to you.' Q. Any talk of
figures at that time? A. None to me. Q. None between Levis
and you? A. No. Q. Did you talk any further with Wakefield
in that outer room? A. No."

Low also said that he never met Levis again; that he had
no other conversation with him; except that on two occasions
he talked with Levis over the telephone.

Mack also testified that after the dinner Kleinberger called
him into another room and said: " ' Mack, come in, I want to
speak to you.' We went in the lounge. He says, ' Mr. Levis
has got a plan that will work right. We have gone over this,
Wakefield, Levis and myself, and it will work all right. Here
is the plan.' He said Mr. Low would tell me of it. That Mr.
Levis, who was in the far end of the lounge, called Mr. Low
over. Mr. Low went over and they sat on the sofa for perhaps
half an hour. Then Mr. Low came over and said, ' Now, Mr.
Mack, let us sit down. I want to tell you what this bunch of
crooks are up to.' I was all alone with Low. Then he said,
' Look here. What they want to do is ' — no, let me go back a
little. When Kleinberger called me out first from the table
the first thing he wanted to know was whether I could raise
$15,000. I said I could not. He says, ' I tell you, Mack,
these things can't be done without money. We have to have
money. I am not alone you understand.' I said ' I fully
understand you are not alone.' I says ' $5,000 would be abso-
lutely the limit I could raise.' He says ' Mr. Mack, you know

these things can't be done for little money, but you talk with Low and he will tell you all about the plan. Then we will talk about money afterwards.' Low told me, ' What they want to do is this: They want to sell the books of the Jackson-Mack Company, which include all the evidence against your brother, for whatever sum you have agreed on or can agree on with Kleinberger, selling those books to any one you may name. Then they want your brother to walk around a little while in town and afterward give himself up and Levis will see no evidence against him.' I said I would not touch that with a ten-foot pole. Q. Low said that to you? A. Yes, sir. ' If you want to carry this on I am out of it.' I said, ' Mr. Low, why not carry it a little further. Let me find out what the bottom of it is?' He said, ' Go ahead and come to see me in the morning.' He went home and I started to dicker with Kleinberger."

Mack further testified that Wakefield said to him, "' I can't be known in a matter of this kind. I am not in it. Whatever Kleinberger arranges for is all right and Mr. Levis will carry it out.' He says ' You can rest assured your brother will be on the job in a couple of months and make more money than he ever did.' That was Wakefield talking to me. Then Wakefield left me and went over and talked to Levis and Kleinberger came back and said: ' I tell you $5,000 won't do. There is three of us. $2,000 apiece, $6,000; you have to raise that.' I says ' I have got to try.' He says ' When can you get the money? When can you get the money? When can you give me a decided answer?' I said ' Low told me how this thing was to be arranged. I don't know. I will have to talk to Low first and see if the thing is right and I will have to go back to Allentown to see to raise the money.' He says ' What day will you get it?' I forget what day I made it. I wanted a little time. I didn't try to raise any money. I thought over this thing and afterward came back to Kleinberger and said, ' Say, I can't raise over 3,500.' Q. When did you say that to him? A.

Probably a week after.   Q. Where did you see him?   A. In his office."

Mack also testified that Levis did not talk much; that Kleinberger did practically all of the talking, and that he reported to Low the next morning.

Kleinberger became a witness for the People and testified that he made an agreement with Low and Mack to deliver the books in question into the custody of Mack, and that he subsequently proceeded to carry out the agreement by having the books sold at auction in the latter part of November; that he procured a relative to appear at the sale and purchase the books and deliver them to his, Kleinberger's office, and that he turned them over to a person who posed as a representative of the defendant Mack but who, in fact, was a police officer acting under the instructions of the district attorney, and that he received for the books an envelope containing what he supposed to be the sum of $6,000 in money, but which proved to contain merely worthless paper.

Levis and and Wakefield appeared before the grand jury and denied that they were concerned in any scheme whatever. They gave an entirely different version of the occurrences at the dinner.

In support of the motion to dismiss the indictment it is claimed, on behalf of Levis, that his legal rights were ignored and disregarded and that there was introduced before the grand jury a mass of incompetent, illegal and highly prejudicial testimony tending to inflame the minds of the jurors against him.

It is claimed that the proceeding began with a reference to unrelated crimes.  The first witness, Assistant District Attorney O'Malley, was questioned concerning six other indictments against Salo J. Jackson and Max Stember who were officers of the Jackson-Mack Company.  He said that the defendant Jackson had pleaded guilty to one of these indictments and had been sent to State prison, and that Max Stember had

received immunity and had become a witness for the State. He also stated that according to his information the defendant Mack had fled the jurisdiction of the court and was a fugitive from justice at the time of the formation of the alleged conspiracy. Not only was all this evidence hearsay and incompetent, but it was highly prejudicial to the rights of the defendant Levis. It called to the attention of the grand jury other crimes with which Mack had had no connection, and it could not have been received in evidence in any court on the trial of Mack on the indictment against him. (People v. Molineaux, 168 N. Y. 264, 16 N. Y. Crim. 720; People v. Grutz, 212 id. 72.)

If it had been proper to refer to the conviction of Jackson, there is an express statute which requires that the conviction must be proved by the record and not by parol. (Penal Law, § 2444; People v. Cardillo, 207 N. Y. 70.) It prejudiced the rights of Levis as there was other testimony that Mack had been an officer of the corporation known as the Jackson-Mack Company, of which Jackson and Stember were also officers, and that Levis' firm instigated the criminal proceedings against Jackson, Stember and Mack, and that the lawyer whose firm moved the wheels of justice against Jackson, Stember and Mack, who caused the conviction and imprisonment of Jackson and the flight of Mack, subsequently tried to impede and to prevent the successful prosecution of the defendant Mack.

On the same grounds the defendant Levis complains of the testimony of Low and Mack concerning alleged attempts of Wakefield and Kleinberger to extort money on other occasions.

Low testified that Kleinberger wanted him to hold up Smith & Schipper for $75,000 as appears from the following: " Kleinberger said, ' What we want to do is to have Mack come back here and testify that certain trust receipts of the Raw Silk Trading Company were assigned to him prior to the bankruptcy matter and turned over to Smith & Schipper and they could hold them up for $75,000.' Q. Smith & Schipper are a very

reputable concern? A. Yes, sir. Q. What did this mean by
saying they could hold up Smith & Schipper for $75,000? A.
My understanding — I don't know what it meant. My im-
pression was that they would be able to show Smith & Schipper
they knew the inside situation and get money from Smith &
Schipper. Q. Do I understand the Raw Silk Trading Company
was claiming certain rights to property because of trust receipts
which had been executed more than four months before the
bankruptcy? A. I got that impression. Q. Since the grand
jury wants to have your impression of the situation, did you
understand that if these trust receipts were shown to have been
executed before the bankruptcy they could be voided and the
property or the money of this company could be added to the
bankrupt estate? A. I did. I also had a different impression,
but it is only an impression. Q. Were Smith & Schipper credi-
tors of this firm? A. That I don't know. I never had dealings
with Smith & Schipper. I know the Raw Silk Trading Com-
pany, at a later date, had reclamation proceedings in connection
with the Jackson-Mack Company. They brought reclamation
proceedings in the Jackson-Mack bankruptcy matter and claimed
certain goods, silks I think, and the trustee also claimed them
and that probably related to the same matter, but whether or not
I don't know as I never represented Mr. Mack in the Jackson-
Mack bankruptcy proceedings."

Further reference to this transaction is found on page 83:
" I understand the above to refer to the Raw Silk Trading Com-
pany he spoke to me about a year before.' Q. You wanted Mack
as a witness? A. Yes, sir."

John M. Mack testified, among other things, as follows:
" Q. All you know about Levis and Wakefield being mixed
up in the money matter comes through Mr. Kleinberger? A.
Yes, sir. Q. Ever have a telephone talk with either Mr. Wake-
field or Mr. Levis? A. About two years ago, I think in Deem-
ber or January, at the request of John Buckley of Allentwn,

I went to Wakefield's office. He said 'Wakefield wants to see you in connection with your brother's case.' I made myself known. Mr. Wakefield asked me in the office and said, 'Mr. Mack, where is your brother?' I said, 'I know he is out West, where I don't know.' He said, 'Look here. As trustee I want to make a pretty good showing. You have got some money, haven't you?' I said yes. 'Have you got $50,000?' I said no. I says 'What do you want $50,000 for?' 'Now,' he says, 'I have got to get $50,000 to make things look right at all out of the Jackson-Mack Company and I thought you could put it up.' I said, 'No, Mr. Wakefield, I would not if I had it. I would not put it up under any conditions because I don't think you are asking me to do the right thing.' 'Now,' he says, 'could you give me directions where I could meet your brother if I go out West?' I said no. He said 'I tell you, I would like to go in swimming and rub elbows with him and have a talk for five minutes with him.' I says 'I could not direct you where he is.' I said 'What do you expect to prove? You know very well Joe was trimmed of every cent he had.' He says 'I tell you this fellow Gerli has got some money. I am quite sure he has got some money,' and he says, 'I think if we got hold of Joe we might be able to prove that he had crooked connection with the Jackson-Mack Company. I think we could get that out of him.' He said 'Do you know his own uncle?' 'No, I have heard of him and met him but don't know him.' He says 'He is a very wealthy man.' That was about all the talk I had with Wakefield but he said 'Will you come back and let me know?' I said I would go and see Low. I went and reported to Low. This is two years ago. Q. Did you see Mr. Wakefield between that time and the time you had dinner with him? A. No, only at the dinner. Q. Was your understanding at the time of this conversation two years ago that this $50,000 that was wanted from you was to go into the estate? A. No; he said he had to make a good showing for the Jackson-Mack

Company. Q. What was your understanding of those words? A. I did not have any understanding. I could not even place it at that time. Q. Did you think he was going to use any of that money to buy creditors off? A. No, I did not think that at that time. I really was so much in the dark that I thought Mr. Wakefield was working to get them some money from Gerli. I could not place any opinion of my own then."

The effect of this testimony manifestly could not fail to instil a hostile feeling in the minds of the grand jury and to create the impression that the defendant was a member of a band of conspirators whose practice it was to extort money from honest merchants.

It is true that if a conspiracy be proved all the facts and declarations of one conspirator in furtherance of the conspiracy are binding not only on the individual committing the act or making the declaration, but against all the co-conspirators. This, however, does not permit of the introduction of matter which is strictly narrative, or which can in no way be considered an act or declaration in furtherance of the corrupt agreement.

Throughout the testimony of Low and Mack there is interwoven evidence which is incompetent, illegal and highly prejudicial to the defendant. In this case it was proper, in my opinion, for Low to repeat to Mack any proposition that had been made to him by Levis. While, therefore, it was admissible to prove what Levis said to Low, or what Wakefield and Kleinberger said to Low and Mack in furtherance of the conspiracy, upon no theory of law was it proper to permit Mack to testify before the grand jury that Low said: " Now, Mr. Mack, let us sit down. I want to tell you what this bunch of crooks are up to." Nor was it proper to permit Mr. Mack to testify as follows: " Q. Why did you understand that Mr. Low wanted you to pursue this matter after this dinner? Did he tell you why? A. Mr. Low's contention was and mine, I agreed with him, that it was a frame-up against my brother from the be-

ginning and this was the first chance I saw we could get next to whatever the frame-up was. Q. What do you mean by a frame-up? A. I mean this crook had been framing me up for perhaps some time before. My business experience has been right straight through that when a crowd of crooks of that kind can get a chance they will buy the private secretary or stenographer and everything to obtain their ends."

It is further urged that District Attorney Perkins should not have been permitted to testify as follows: " Q. The subject of that dinner conversation was in connection with the disposal of some books or selling some books that were needed as evidence by the district attorney to prosecute one Mack? A. The suggestion was made to him at that dinner."

Of course, it was competent for Mr. Perkins to testify that Low had called to see him, and that he had acted under his instructions from the time of that visit, but the foregoing testimony was clearly inadmissible. The answer that " The suggestion was made to him at that dinner " was incompetent; it was highly prejudicial to Levis, as it was in fact a declaration that the district attorney believed that Levis was guilty of the crime. It could not fail to impress the jury.

The testimony given by Mr. Perkins that he had known Walter Carroll Low for a great many years could have had only one effect upon the minds of the grand jury, and that was that Low was an honest man and that the district attorney had confidence in his integrity.

When we consider that Mr. Perkins had been the assistant district attorney in charge of grand jury matters for a great many years, and that he was personally and favorably known to the jurors and highly regarded by them for his excellent work, it must be admitted that this testimony was extremely damaging to the defendant. It also tended to corroborate Low by a reference to statements made by him on a previous occasion. It was not claimed that Low was an accomplice; and in

my opinion there was a plain violation of the legal rules referred to by the Court of Appeals in the case of People v. Jung Hing (212 N. Y. 393).

Low also testified that he never met Levis after the dinner at the Claridge Hotel. He was permitted to testify, however, that on two occasions he had communicated with him over the telephone, to wit, in July and in November. This testimony should not have been received in evidence without proof that Low knew the person to whom he was speaking was Levis. A careful examination of the testimony will show that Low was never asked whether he knew that Levis was on the wire, or that he knew Levis' voice. It cannot be inferred that Low knew that it was the voice of Levis. That must be proved by his testimony, and he is strangely silent on this point, although many other witnesses were carefully interrogated as to whether or not they recognized the voice of the person to whom they were speaking. (Murphy v. Jack, 142 N. Y. 215.)

For this reason the testimony as to telephonic connection of July was clearly inadmissible. As Levis admitted that he had some talk on the telephone with Low on the thirtieth of November, the error may have been cured so far as that conversation was concerned.

The alleged telephonic conversation of July was very damaging to the defendant Levis. Low testified as follows: " The substance of it was that Mr. Levis assured me that all the books had been in his possession and would be sent by him to Shongood to be sold and I could absolutely rely on the fact that all the books would be turned over."

The minutes of the grand jury show many other instances of the reception of incompetent and prejudicial testimony. For the purpose of this motion I have only referred to those glaring errors which have substantially affected the defendant's rights. Nor can these errors be considered as technical in their nature. The failure to prove that an indictment was pending against

Mack and the failure to prove that the books were material and competent testimony against Mack in themselves would compel the dismissal of the indictment; and the illegal and incompetent evidence was of such a prejudicial nature that it must have strongly influenced a jury of laymen not versed in the rules of legal proof.

In presenting cases to the grand jury the district attorney should keep in mind that he owes a duty to the persons charged with crime. He should remember that there is a positive mandate that only legal evidence should be presented. In the present case the proceedings began with illegal and prejudicial testimony given by an assistant district attorney. Throughout the case incompetent and highly prejudicial evidence was constantly received and the case was submitted to the grand jury with a denunciation of the defendants as a " bunch of crooks " ringing in their ears.

In People v. Glen (173 N. Y. 395, 400, 17 N. Y. Crim. 225), the Court of Appeals, through the late Judge WERNER, said: " From time immemorial our common-law courts have exercised the power to set aside and quash indictments on motion, not only for defects in form, but for irregularities and errors that were proved. * * * But our courts have also always asserted and exercised the power to set aside indictments whenever it has been made to appear that they have been found without evidence, or upon illegal and incompetent testimony. (U. S. v. Coolidge, 2 Gall. 364; People v. Restenblatt, 1 Abb. Pr. 268; People v. Briggs, 60 How. Pr. 17.) This power is based upon the inherent right and duty of the courts to protect the citizen in his constitutional prerogatives and to prevent oppression or persecution."

This case is of great importance to the community. The crime charged against the defendant strikes at the very fountainhead of justice. An officer of the court is charged with an attempt to defeat the conviction of a person charged with a

serious crime.   It is of the utmost importance to the courts and to the bar that such a crime, if committed, should not go unpunished.

Appreciating the importance of this charge, I shall therefore grant leave to the district attorney to resubmit the same to the grand jury, and I suggest that he be mindful of the words of Mr. Justice MARCUS, in People v. Walsh (92 Misc. Rep. 579) : " It will be assumed that no evidence will be received by them which would not be admissible on a trial."

The motion of the defendant Levis to dismiss the indictment against him is granted, with leave to the district attorney to resubmit the matter to the grand jury.

Motion granted.